**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

2025 JAN 10  PM 11: 24

U S DISTRICT COURT SDNY

```
------------------------------X
```

RALPH W. BAKER, JR.,

                Plaintiff,

    -against-

NIKOLE HANNAH-JONES, et al.,

              Defendants.

```
------------------------------X
```

Case No. 1:24-cv-08760-JMF

RECEIVED
JAN 13 2025
PRO SE OFFICE

## MEMORANDUM OPINION AND ORDER TO SHOW CAUSE

Ralph W. Baker, Jr.
112 South Elliott Place
Brooklyn, NY 11217
917-697-8168
ralphbakerjr@msn.com

# TABLE OF CONTENTS

**Page(s)**

Table of Contents ……………………………………………………………………i

Table of Authorities …………………………………………………………....i

Plaintiff Has A Valid Claim …………………………………………………………1

Plaintiff's Claims Are Not Time Barred ……………………………………………2

Judicial Notice Of Similar Complaint………………………………………………3

Defendants' Actions Represent Unfair Competition……………………………...6

Contributory Infringement………………………………………………………9

Unfair Use……………………………………………………………………...12

Defendants Copied Plaintiff's Arrangement Of Words………………………………21

**Page(s)**

**Case**

Baker v. Coates et. al………………………………………………………………5, 21

Business Trends Analysts v. Freedonia Group, 887 F.2d 399 (2d Cir. 1989)……………..12

Clifford Ross Co. v. Nelvana, Ltd., 710 F. Supp. 517 (S.D.N.Y.),…....……………………7

Construction Technology v. Lockformer Co.,

704 F. Supp. 1212, 1222-23 (S.D.N.Y.1989)………………………………………………..8

Digital Millennium Copyright Act. Viacom International, Inc. v. YouTube, Inc.,

676 F.3d 19 (2d Cir. 2012)…………………………………………………… 11

Folsom v. Marsh, 9 F. Cas. 342 (1841)…………………………………………… 13

Gershwin Publishing Corp v Columbia Artists Management Inc, ………………………………11

Hartfield v. Peterson 91 F.2d 998 (2d Cir. 1937) ………………………………………4, 21

Holmes v. Hurst, 174 U.S. 82 (1899) ………………………………………………4

Jefferys v. Boosey, 4 H.L.C. 815,……………………………………………………8

Jorgensen v. Epic/Sony Records No. 00 Civ. 9181 (JFK) (S.D.N.Y. Sep. 23, 2002) ……………1

Kalem Co. v. Harper Bros., 222 U.S. 55 (1911)…………………………………………

King v. Allied, 807 F. Supp. 300 (S.D.N.Y. 1992) ………………………………………7

Lahr v. Adell Chemical Co., 300 F.2d 256, 259 (1st Cir. 2916)………………………………9

Midler v. Ford, 849 F.2d 460 (9th Cir. 1988) ……………………………………….8, 9

Montgomery v. Holland, 408 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) ……………..…………11

Patterson v. Century Prods., 93 F.2d 489, 493 (2d Cir. 1937)…………………………...11

PAUL TREMBLAY, et al., v. OPENAI, INC., et al., ………………………………………8

Case Nos. 23-cv-03223-AMO 23-cv-03416-AMO…………………………………………

Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487 (2d Cir. 1960) ……………………4

Steinberg v. Columbia Pictures Industries, 663 F. Supp. 706 (S.D.N.Y. 1987)………………14

Taylor v. Meirick, 712 F.2d 1112 (7th Cir. 1983) ……………………………………...3

Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 513-15 (S.D.N.Y. 2008)…………………12

White-Smith Music Co. v. Apollo Co., 209 U.S. 1 (1908)…………………………………4

Wojnarowicz v. Human Family Assn., 745 F. Supp. 130 (S.D.N.Y.1990) ………………………7

i

U.S. v. Pierce, 785 F.3d 832, 841(2d Cir. 2015) ……………………………………………....6

U.S. v. Stuckey, 253 F. App'x 468 (6th Cir. 2007) ……………………………………………7

Ralph W. Baker, Jr. ("Plaintiff") respectfully submits an Order to Show Cause (the "Order") why his Complaint against defendants Nikole Hannah-Jones ("Hannah-Jones" or "defendant"), Ibram X. Kendi ("Kendi" or "defendant") and others should be allowed to proceed forward. Plaintiff respectfully asks your Honor not to dismiss the Complaint for the following reasons. Here, Plaintiff refers to "The 1619 plagiarized works," the "Kendi plagiarized works" and together, the "plagiarized works" as defined in the Complaint.

## PLAINTIFF HAS A VALID CLAIM

Plaintiff has a valid cause of action for a copyright claim in New York. Plaintiff owns a valid copyright. The registration number for *Shock Exchange: How Inner-City Kids From Brooklyn Predicted the Great Recession* ("Shock Exchange") is TXu001822615, filed in 2012. Plaintiff can prove defendants copied the original components of Plaintiff's work without permission. Shock Exchange is original. Shock Exchange was reviewed by Library Journal in March 2013 – one of the only independently-published books ever reviewed by a major book reviewer. Shock Exchange exists in a tangible medium of expression, and a copyright has been registered with the Copyright Office. Shock Exchange is Plaintiff's original work. Plaintiff created Shock Exchange with a pen and blank sheet of paper in 2012.

Plaintiff can prove access. "To establish access, Plaintiff must show more than a bare possibility of access. *Siskind, 1987 WL 11701.* Access means 'hearing or having a reasonable opportunity to hear the plaintiff's work, in other words having the opportunity to copy.'" *Jorgensen v. Epic/Sony Records No. 00 Civ. 9181 (JFK) (S.D.N.Y. Sep. 23, 2002).* Defendants had a reasonable opportunity to read the Plaintiff's work, hear about it and copy it. Plaintiff mailed a copy of *Shock Exchange* directly to Keisha Blain ("defendant"), who wrote a chapter for *Four Hundred Souls: A Community History of African America, 1619-2019* ("Four Hundred Souls").

Plaintiff understands Ms. Blain co-owns the copyright for the book. Ms. Blain acknowledged receipt of Shock Exchange in August 2015. Ms. Hannah-Jones acknowledged Jelani Cobb ("Cobb" or "defendant") as a scholar who supported "the original version of the project." Plaintiff mailed Cobb a version of Shock Exchange circa 2013. A review of *Shock Exchange* appeared in the March 2013 edition of *Library Journal*, one of the top four pre-publication book reviewers in the country. An interview with the Plaintiff and description of *Shock Exchange* appeared in *SLAM Magazine* in October 2022.[1] *Shock Exchange* was distributed via Barnes & Noble bookstores and several independent bookstores in New York City. *Shock Exchange* was heavily disseminated online at Amazon.com and available via ebook on Kindle, iTunes and several other online bookstores. It was available in hundreds of libraries across the country. Plaintiff promoted *Shock Exchange* from his website, https://newyorkshockexchange.com/ and on Twitter (@shockexchange).

## PLAINTIFF'S CLAIMS ARE NOT TIME BARRED

The Court suspects Plaintiff's "copyright claims may be time barred." The fact pattern suggests otherwise. Based on the Second Circuit's "discovery rule," the claims would not be time barred. The Complaint noted The 1619 Project, "backed by the bullhorn of the New York Times, won the Pulitzer Prize."

Plaintiff's reference to "the bullhorn of the New York Times" was an argument he heard historians make years after The 1619 Project was published. The intimation was that it was odd for the New York Times Company to promote a project that historians disagreed with and considered ahistorical. Plaintiff does not read the New York Times. Plaintiff rarely, if ever, follows any content produced by the corporate media. Plaintiff recently subscribed to the New York Times to learn about The 1619 Project. Plaintiff understands it was promoted as a project

about slavery. Plaintiff is well-aware of slavery. Plaintiff would be disinclined to reading a book about a subject he is aware of.

Ms. Hannah-Jones also wrote a chapter for Four Hundred Souls, which was also plagiarized from Shock Exchange. Ms. Hannah-Jones copied Plaintiff's arrangement of words for Four Hundred Souls, just like she did for The 1619 Project; this is a continuation of the infringing act. Per Taylor v. Meirick, "Merick's infringement was a continuing wrong. He copied Taylor's maps in 1976 and 1977 and either sold copies till 1979, which was well within the three years of the bringing of this suit, or at least became a party to infringements by his dealers which continued till after the suit was filed. The initial copying was not a separate and completed wrong but simply the first step in a course of wrongful conduct that continued till the last copy of the infringing map was sold by Meirick or with his connivance." <u>Taylor v. Meirick</u>, 712 F.2d 1112 (7th Cir. 1983). Four Hundred Souls was published by One World (imprint of Penguin Random House) February 1, 2022. Plaintiff respectfully asks the Court for leave to amend the Complaint. Plaintiff combined the cases against Ms. Hannah-Jones and Kendi – rather than filing two separate cases – to preserve precious judicial resources.  Such amendment would include sharply reducing the number of defendants and co-defendants listed in the Complaint.

<u>JUDICIAL NOTICE OF SIMILAR COMPLAINT</u>

Plaintiff understands the Court made judicial notice of Plaintiff's previous claim against Ta-Nehisi P. Coates ("Coates" or "defendant"). Plaintiff originally relied on the facts and the evidence in the complaint. When Plaintiff realized the District Court could not see the similar expressions between Shock Exchange and the defendants' work, Plaintiff responded to the District Court with a detailed explanation of the accused passages, and why they represented infringement. Plaintiff understands there is no bright line test for infringement, and "Decisions

must therefore inevitably be ad hoc." <u>Peter Pan Fabrics, Inc. v. Martin Weiner Corp.</u>, 274 F.2d 487 (2d Cir. 1960). Plaintiff asks the Court to make a decision on this case independent of previous cases.

In his appeal to the Second Circuit, Plaintiff gave a more objective measurement of his language and arrangement of words – Shock Exchange rhythmic prose and tedious talk – and gave even more case law, proving copying by defendants. Per <u>Holmes v. Hurst</u> an author's arrangement of words is protectable: "The right thus secured by the copyright act is not a right to the use of certain words … But the right is to that arrangement of words which the author has selected to express his ideas … The nature of this property is perhaps best defined by Mr. Justice Erle in <u>Jefferys v. Boosey</u>, 4 H.L.C. 815, 867: 'The subject of property is the order of words in the author's composition.'" <u>Holmes v. Hurst</u>, 174 U.S. 82 (1899).

Defendant(s) copied a substantial portion of Plaintiff's literary composition, which was illegal, "The defendant here could not copy any substantial part of the arrangement or expression of Hartfield's combination and, because we think there is good reason to believe that he did, we agree with the conclusion of the court below." <u>Hartfield v. Peterson</u> 91 F.2d 998 (2d Cir. 1937). The threshold for "substantial part" in Hartfield was 21 per cent. <u>Hartfield</u>, 91 F.2d at 1000-1001. Defendants only have to copy the arrangement of words to run afoul of copyright infringement. Per <u>White-Smith Music</u>, "'This court has substantially decided that the subject of property in a copyrighted musical composition is the order of the notes in the author's composition, by adopting in *Holmes v. Hurst*, 174 U.S. 86, Mr. Justice Erle's definition of the subject of property in a book or literary composition as being 'the order of the words in the author's composition.' And the same thing must also be true as to the notes of a musical

4

composition. The only thing that has to be copied to constitute a copy of the copyright property is the order in which the notes were set down."

There was a substantial similarity between the top 5 repeated words, and the next four most-repeated words in Plaintiff's arrangement(s) and defendants' arrangements. The following chart from the appellate brief illustrates the similarities were multiples of the threshold in Hartfield. Baker v. Coates, et al. DktEntry: 70.1. Plaintiff established with the District Court and defense attorneys that defendants' language was incoherent and had no forward movement. The only purpose it served was to mimic Plaintiff's language and arrangement of words. Plaintiff's analysis proved that they got there.

### Analytical Dissection - Shock Exchange v. Coates' Plagiarized Works

| Plagiarized Work | Arrangement / Scene | Shock Exchange Arrangement / Scene | Total Occurrence v. Shock Exchange | |
| --- | --- | --- | --- | --- |
| | | | Top 5 Repeated Words | Next 4 Repeated Words |
| Chosen By District Court - Between | Cmplt. Ex: F ¶ I | Cmplt. Ex: E ¶ I | 65% | 62% |
| Water Dancer | H-O-R-S-E | H-O-R-S-E | 148% | 114% |
| Water Dancer | Lake Geneva | Lake Geneva | 68% | 77% |
| 2014 Essay | Redlining | Redlining | 74% | 89% |
| 2015 Essay | Mass Incarceration | Mass Incarceration | 72% | 76% |
| Water Dancer | Parade | Parade | 138% | 120% |
| Water Dancer | Switch | Switch | 79% | 87% |
| Between | Switch | Switch | 83% | 93% |
| Black Panther Movie | Switch | Switch | 92% | 100% |
| Black Panther Comic | Switch | Switch | 88% | 100% |
| Captain America Comic | Switch | Switch | 142% | 107% |
| Mean - Entire Dissection | Switch | Switch | 97% | 98% |
| Median - Entire Dissection | Switch | Switch | 90% | 100% |
| Water Dancer | Switch | Lake Geneva | 76% | 100% |
| Between | Switch | Lake Geneva | 80% | 108% |
| Black Panther Movie | Switch | Lake Geneva | 88% | 115% |
| Black Panther Comic | Switch | Lake Geneva | 84% | 115% |
| Captain America Comic | Switch | Lake Geneva | 136% | 123% |
| Mean - Entire Dissection | Switch | Lake Geneva | 94% | 110% |
| Median - Entire Dissection | Switch | Lake Geneva | 86% | 112% |
| Black Panther Movie | Cmplt. Ex: I ¶ XVI | Switch | 88% | 100% |
| Water Dancer | Cmplt. Ex: B ¶ III | Cmplt. Ex: B ¶ I | 95% | 93% |
| Eight Years | Reconstruction | Reconstruction | 81% | 85% |

Source: Ralph W. Baker, Jr., Complaint pursuant Baker v. Coates, et al., DktEntry 30.1, Dkt. 150.

The accused works ("Plagiarized Works") per the chart are across books, articles, comics and the Black Panther Movie. Certain of the passages show defendants copied 100 per cent of Plaintiff's expression ("total occurrence"). In certain instances, defendants' language was even more dense than Plaintiff's. Eight people – Coates, Chris Jackson, Victoria Matusi, Nicole Counts, Roxane Gay, Yona Harvey, Ryan Coogler, Joe Robert Cole – copied Plaintiff's language and arrangement of words. Stan Lee also took writing credit for the Black Panther movie. Pursuant to 17 U.S. Code § 102(a), copyright protection subsists for original literary works fixed in a tangible medium of expression that can perceived, reproduced or communicated. For the avoidance of doubt, this is actual copying. It also proves Plaintiff's language and arrangement of words – Shock Exchange rhythmic prose and tedious talk – is a protectible expression.

## DEFENDANTS' ACTIONS REPRESENT UNFAIR COMPETITION

In an October 2019 interview with Kendi, Coates intimated that One World (imprint of Penguin Random House) editors Chris Jackson ("defendant"), Victoria Matusi ("defendant") and Nicole Counts ("defendant") wrote *The Water Dancer* ("Water Dancer").[1] In Water Dancer defendants confessed to (i) stealing Plaintiff's identity and his "special knowledge" (ii) copying Plaintiff's language, arrangement of words, (iii) forging documents, (iv) editing and augmenting documents, and (v) leading a secret army at war with the Plaintiff. (Cmplt. Ex: A). The Second Circuit ruled rap lyrics may be properly admitted at trial "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." U.S. v. Pierce, 785 F.3d 832, 841(2d Cir. 2015). The confession establishes the element of a crime, and proves motive and intent, "You can certainly not say when somebody writes about killing snitches, that

---

[1] Baker v. Coates et al. Case 1:22-cv-07986-JPO-SLC, Dkt. 120.

it doesn't make the fact that they may have killed a snitch more probable .... " U.S. v. Stuckey, 253 F. App'x 468 (6th Cir. 2007).

The fact pattern suggests Chris Jackson, other editors, and Coates are using Shock Exchange to train authors how to copy Plaintiff's language and arrangement of words. This has created confusion in the marketplace and represents unfair competition under the Lanham Act and New York Common Law Act. The Lanham Act prohibits activities like trademark infringement, trademark dilution, false advertising, and unfair competition. Unfair competition involves market conduct which gains or seeks to gain an advantage over rivals through misleading, deceptive or fraudulent conduct in trade or commerce. Through the plagiarized works, defendants engaged in misleading, deceptive, and fraudulent conduct. In King v. Allied, 807 F. Supp. 300 (S.D.N.Y. 1992), the Southern District granted an injunction to Stephen King and concluded (1) the possessory credit was false and (2) the based upon credit was misleading. This violated section 43(a) of the Lanham Act.

Defendants' plagiarized works violated 43(a) of the Lanham Act. Defendants falsely alleged that they were the originators of the plagiarized works, and misappropriated from Plaintiff's literary skills. It will result in irreparable harm. Plaintiff's work has been misattributed to a prominent author; reputational harm has been immeasurable. Clifford Ross Co. v. Nelvana, Ltd., 710 F. Supp. 517 (S.D.N.Y.), aff'd without op., 883 F.2d 1022 (2d Cir.1989); Wojnarowicz v. Human Family Assn., 745 F. Supp. 130 (S.D.N.Y.1990). Plaintiff need not demonstrate lost profits or tangible damage to his reputation to show irreparable harm.

New York Common law of unfair competition is analogous to the Lanham Act's unfair competition laws. Defendants have clearly violated the Lanham Act and New York common law. Plaintiff is likely to succeed on the merits of his claim under New York General Business

Law §§ 349, 350 and 368-d, which provide a private right of action for persons injured by deceptive acts or false advertising in the conduct of business. These provisions prohibit materially false and misleading advertisements which markedly affect the public. See, e.g., Construction Technology v. Lockformer Co., 704 F. Supp. 1212, 1222-23 (S.D.N.Y.1989).

The Ninth Circuit recently adopted Plaintiff's legal argument. Under California's Unfair Competition Law ("UCL"), Plaintiffs argued defendants used copyrighted material to train ChatGPT without plaintiffs' permission. In PAUL TREMBLAY, et al., v. OPENAI, INC., et al., Case Nos. 23-cv-03223-AMO 23-cv-03416-AMO. The U.S. District Court for the Northern District of California cited California's unfair competition law prohibits "not only unlawful business practices but also unfair business practices. The statute is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not forbidden by law." Tremblay. In addition, "Assuming the truth of Plaintiff's allegations – the Defendants used Plaintiff's copyrighted works to train their language models for commercial profit – the Court concludes that Defendants' conduct may constitute an unfair practice … this portion of the UCL claim may proceed." Tremblay. For those same reasons, Plaintiff alleges defendants have run afoul of the Lanham Act and New York Common Law Act.

Per Jefferys, "The order of each man's words is as singular as his countenance …," or the equivalent of "one's face." Jefferys v. Boosey, 4 H.L.C. 869. In copying the order of words in Plaintiff's literary composition, defendants have stolen Plaintiff's face and/identity. Bette Midler sued Ford for running commercial impersonating her voice. In Midler v. Ford, the court asserted that to impersonate Ms. Midler's distinctive voice "is to pirate her identity … We hold only that when a distinctive voice of a professional singer is widely known is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in

8

California." <u>Midler v. Ford</u>, 849 F.2d 460 (9th Cir. 1988). Bert Lahr sued Adell Chemical Co. for using a commercial that imitated Lahr's distinctive voice. "The First Circuit held that Lahr had stated a cause of action for unfair competition, that it could be found 'that defendant's conduct saturated plaintiff's audience, curtailing his market.'" <u>Midler</u>, <u>Lahr v. Adell Chemical Co.</u>, 300 F.2d 256, 259 (1st Cir. 2916). Plaintiff and his distinctive voice are well-known to the book industry, corporate media, and arguably every Black professor, journalist, and author. Defendants' books, articles and derivative works compete with Plaintiff's book. Defendants' actions represent a tort liability and also represent unfair competition as they have saturated and curtailed the market for Plaintiff's work.

CONTRIBUTORY INFRINGEMENT

Any time one copies or uses the work of an author it is referred to as copyright infringement. To prove copyright infringement, the plaintiff must prove (1) ownership of a valid copyright (usually through the showing of a certificate of registration); (2) the defendant has copied the work; and (3) such copying constitutes unlawful appropriation. Defendants' use of Plaintiff's work without his permission is in fact copyright infringement.

Also, a type of **secondary liability** for copyright infringement in which one party may be held liable for the infringing acts of another party if the party has knowledge of the infringing activity and makes a material contribution in aid of the infringement. **Contributory copyright infringement** is a way of imposing secondary liability for infringement of a copyright. It is a means by which a person may be held liable for copyright infringement even though he or she did not directly engage in the infringing activity. It is one of the two forms of secondary liability apart from vicarious liability. Contributory infringement is understood to be a form of infringement in which a person is not directly violating a copyright but induces or authorizes another person to

directly infringe the copyright. Defendants have infringed upon the rights of the Plaintiff Ralph W. Baker, Jr. and his works, and profited from this infringement.

When another party uses or distributes your copyrighted work without consent, he or she may be found liable for copyright infringement. There are several types of copyright infringement including the following:

- **Direct infringement:** A party uses copyrighted work without consent from the owner of the copyright.
- **Contributory infringement:** A party aids in another party's unauthorized use of the copyrighted work.
- **Vicarious infringement:** A company benefits from a party's infringement, despite having the ability to stop the infringement.

<u>Proving Copyright Infringement</u>

Plaintiff can prove defendants have wrongfully misappropriated his work. Proving copyright infringement requires you to prove that you are the owner of the copyright and that another party copied the copyrighted work. Parties accused of copyright infringement may claim that their use of the copyrighted work is legal, as it is considered fair use. Under the concept of fair use, a party may use a copyrighted work in limited circumstances (e.g., for educational or comedic purposes). In the case at bar, the defendants used the Plaintiff literary work which consisted of subjects ranging from reconstruction, mass incarceration, the housing market, reparations, social unrest, financial literacy the vital signs of the economy.

In this case, the Plaintiff has not given defendants or anyone else permission to use his work. In the U.S. the doctrine of contributory infringement is based on the 1911 case of _Kalem v Harper Brothers_. *(Kalem Co. v. Harper Bros., 222 U.S. 55 (1911).* The ingredients of contributory infringement were laid down in the Second Circuit Court of Appeals decision

in *Gershwin Publishing Corp v Columbia Artists Management Inc.* ( ***Gershwin Publishing Corp.
v. Columbia Artists Management, Inc.***, 443 F.2d 1159 (2d Cir. 1971) in which the court said
that contributory infringement is said to happen when someone, with knowledge of the infringing
activity, induces, causes, or materially contributes to the infringing conduct of another. The
Defendant's action of infringement caused and materially contributed to the infringing conduct
against the Plaintiff. Due to this infringement, the Defendant has made millions of dollars based
on the work of the Plaintiff. The Plaintiff should be compensated for his literary work. The
Defendants have engaged in contributory infringement.

Although "random similarities scattered throughout the works" do not support a finding of
substantial similarity. Montgomery v. Holland, 408 F. Supp. 3d 353, 363 (S.D.N.Y. 2019). The
work of the Plaintiff is not random similarities. The Plaintiff's work is one hundred percent his
work based on his time, talent, and tremendous skill set in writing this literary work. The actions
of the Defendants exemplify copyright infringement, and they should be held accountable for
their actions.

It was held that willful blindness is knowledge, in copyright law. The court held in the Second
Circuit that Willful Blindness is knowledge in the Digital Millennium Copyright Act. Viacom
International, Inc. v. YouTube, Inc., 676 F.3d 19 (2d Cir. 2012).

In accordance with Section 501 of the Copyright Act, the Defendants would be liable as
"Infringer" and the Plaintiff would be able to seek some recovery. "Quite the opposite: the
purpose of the Copyright Act is to protect authors from infringers, see, e.g., Patterson v. Century
Prods., 93 F.2d 489, 493 (2d Cir. 1937), and the plaintiff is an alleged infringer. "KBL *Corp. v.
Arnouts*, 646 F. Supp. 2d 335 (S.D.N.Y. 2009). Authors such as the Plaintiff Ralph Baker in his
literary work is why we have the Copyright Act which is to protect writers like the Plaintiff.

The Court held "Were Tiffany to prevail in its argument that eBay was willfully blind, the 'reason to know' standard of the Inwood test would be inflated into an affirmative duty to take precautions against potential counterfeiters, even when eBay had no specific knowledge of the individual counterfeiters." Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 513-15 (S.D.N.Y. 2008), Omega, 984 F.3d at 255 ("Tiffany provided a test for identifying which scenarios could result in liability: '[C]ontributory liability may arise where a defendant is . . . made aware that there was infringement on its site but . . . ignored that fact.''), with Tiffany, 600 F.3d at 107.

Yet, the Defendants have made millions of dollars off the work of the Plaintiff. The Plaintiff has not received anything from his work not even an acknowledgment. The Plaintiff is seeking contributory copyright infringement.

Based on the above arguments, there is contributory infringement in which the Plaintiff is entitled to relief. Therefore, the court should rule that the Defendants has committed contributory infringement. The court should make a reasonable and just ruling based on the facts of this case.

<u>UNFAIR USE</u>

The plagiarized works are unoriginal and represent unfair use.; defendants' goal is to copy with evasion. Ms. Hannah-Jones copies Plaintiff's work – and its anomalies – and adds slavery to it as a crude attempt to create the appearance of dissimilarity. Business Trends Analysts v. Freedonia Group, 887 F.2d 399 (2d Cir. 1989). Kendi copies Plaintiff's work and adds mkes up narratives of "racism and anti-racism" to create the appearance of dissimilarity. Business Trends. Historians like Gordon Wood have criticized the The 1619 Project as being ahistorical:

> I read the first essay by Nikole Hannah-Jones, which alleges that the Revolution occurred primarily because of the Americans' desire to save their slaves. She claims the British

were on the warpath against the slave trade and slavery and that rebellion was the only hope for American slavery. This made the American Revolution out to be like the Civil War, where the South seceded to save and protect slavery, and that the Americans 70 years earlier revolted to protect their institution of slavery. **I just couldn't believe this.**

I was surprised … by the scope of this thing, especially since it's going to become the basis for high school education and has the authority of the *New York Times* behind it, and **yet it is so wrong in so many ways** … The idea that the Revolution occurred as a means of protecting slavery—**I just don't think there is much evidence for it, and in fact the contrary is more true to what happened.**[2]

Phillip W. Magness, senior fellow at the Independent Institute, accused Ms. Hannah-Jones of using his work, and then deleting the credit after she found out he criticized the 1619 Project:

… I know quite a bit about Abraham Lincoln and colonization … I wrote an entire book on it … It deals with Abraham Lincoln's approach to resettling the African-American community in the United States … When Nikole Hannah-Jones came under fire for repeating this fact of Lincoln, she started citing my book. And she started tweeting out links to articles I had written in 2013 in the New York Times on this exact subject, documenting Lincoln's colonization. She had not put two and two together that the author of the book she was citing was also me, the critic of the 1619 Project.

And a couple of months later, when she finally figured that out, she does an about-face, deletes all the tweets and starts trashing me and saying I'm not qualified to comment on the 1619 Project. It gets worse than that. In the new book, she changed that exact section on Abraham Lincoln and removed acknowledgement she had previously made and now, in its place, cites Ibram X Kendi's book …[3]

Magness gives evidence that the 1619 Project is unoriginal.  In 2023 Kendi's Center for Antiracist Research was shut down after three years with little to no antiracist research to speak of.[4]

Defendants copied the most important parts of Shock Exchange with the goal of superseding it.

Folsom v. Marsh, 9 F. Cas. 342 (1841). Pursuant to 17 U.S. Code § 107, factors considered in determining fair use of a work include the purpose and character of the use, the nature of the

---

[2] "An interview with historian Gordon Wood on the New York Times' 1619 Project," Tom Mackaman, WSWS.ORG, November 28, 2019.
[3] "Debunking 1619: An Interview with Phillip W. Magness, Jonathan Nicastro, April 25, 2022.
[4] Fanfare, Then Fallout at Antiracist Research Center Reveals Other Fractures, Sara Weisman, Inside Higher Ed, November 7, 2023.

copyrighted work, the amount and substantiality of the portion used in relation to the copyrighted work, and the effect of the use on upon the potential market or value of the copyrighted work. In determining the first factor, courts consider if the secondary use is transformative or if the secondary use is commercial in nature. The plagiarized works are being sold commercially and are not of an educational nature. Lawmakers have pushed to ban the 1619 Project from schools, and Kendi's books have also been banned.[5] The plagiarized works simply supplant Shock Exchange.

The following charts illustrate "Anomalies of Shock Exchange." Plaintiff counted the number of pages defendants repeated Plaintiff's passions and "special knowledge" such as, criminal justice, reconstruction, the black church, redlining, housing and housing wealth, social unrest, reparations, etc. The "1619 Essays" include essays from the New York Times Magazine. The percentage of Plaintiff's anomalies included in the 1619 Essays, the 1619 book, *Stamped From The Beginning* ("Stamped"), 400 Souls are 77%, 63%, 33% and 33%, respectively. These similarities with Shock Exchange speak to unfair use, and can only be explained through copying.  Steinberg v. Columbia Pictures Industries, 663 F. Supp. 706 (S.D.N.Y. 1987).

---

[5] "Lawmakers Push to Ban '1619 Project' From Schools, Sarah Schwartz, EducationWeek, February 23, 2021. "Ibram X. Kendi says a backlash has 'crushed' the nation's racial reckoning. But there's one reason he remains hopeful," John Blake, CNN, March 26, 2023.

## Anomalies Of Shock Exchange

| | 1619 Essays | Total Pages | % Of Total Pages | 1619 Book | Total Pages | % Of Total Pages |
|---|---|---|---|---|---|---|
| Criminal Justice | 11 | 192 | 6% | 55 | 481 | 11% |
| Reconstruction | 15 | 192 | 8% | 18 | 481 | 4% |
| Black Church | 2 | 192 | 1% | 28 | 481 | 6% |
| Redlining | 7 | 192 | 4% | 3 | 481 | 1% |
| Housing / Wealth / Land | 36 | 192 | 19% | 41 | 481 | 9% |
| Revolt, riots, violence, uprisings, unrest | 35 | 192 | 18% | 81 | 481 | 17% |
| Reparations | 9 | 192 | 5% | 9 | 481 | 2% |
| Glass-Steagall, MBS, CDO | 12 | 192 | 6% | 2 | 481 | 0% |
| Panic Financial Crisis | 2 | 192 | 1% | 2 | 481 | 0% |
| Plaintiff's Personal Story | 5 | 192 | 3% | 2 | 481 | 0% |
| Reagan Policies | - | 192 | 0% | 5 | 481 | 1% |
| Massive Resistance | 1 | 192 | 1% | 1 | 481 | 0% |
| Gingrich / Republicans | | | | | | |
| Combat Democrats | 2 | 192 | 1% | 15 | 481 | 3% |
| Blanche K. Bruce | 1 | 192 | 1% | - | 481 | 0% |
| Rodney King | - | 192 | 0% | 1 | 481 | 0% |
| Tobacco | 1 | 192 | 1% | - | 481 | 0% |
| Dexter Avenue | - | 192 | 0% | 2 | 481 | 0% |
| Blacks Denied School | 1 | 192 | 1% | 1 | 481 | 0% |
| Miscegenation | 1 | 192 | 1% | 16 | 481 | 3% |
| Large % Of Blacks | - | 192 | 0% | 2 | 481 | 0% |
| Tax Dollars For Whites | - | 192 | 0% | 1 | 481 | 0% |
| Brown v. Board | 2 | 192 | 1% | 4 | 481 | 1% |
| Civi Rights | 3 | 192 | 2% | 15 | 481 | 3% |
| Sum | 146 | 192 | 76% | 304 | 481 | 63% |

Note 1: Total pages exclude the bibliography and acknowledgements.

Note 2: "1619 Essays" include Bouie, Interlandi, Desmond, Miles, Stewart, Lee, Kruse, Morris, Muhammad, Stevenson, Villarosa, Elliott, Hughes, and Ms. Hannah-Jones.

### Anomalies Of Shock Exchange

| | Stamped | Total Pages | % of Total | 400 Souls | Total Pages | % Of Total | Shock Exchange | Total Pages | % of Total |
|---|---|---|---|---|---|---|---|---|---|
| Criminal Justice | 38 | 511 | 7% | 10 | 392 | 3% | 6 | 330 | 2% |
| Reconstruction | 33 | 511 | 6% | 6 | 392 | 2% | 1 | 330 | 0% |
| Black Church | 1 | 511 | 0% | 16 | 392 | 4% | 4 | 330 | 1% |
| Redlining | 1 | 511 | 0% | 1 | 392 | 0% | 1 | 330 | 0% |
| Housing / Wealth / Land | 4 | 511 | 1% | 5 | 392 | 1% | 40 | 330 | 12% |
| Revolt, riots, violence, uprisings, unrest | 26 | 511 | 5% | 67 | 392 | 17% | 10 | 330 | 3% |
| Reparations | 4 | 511 | 1% | 5 | 392 | 1% | 1 | 330 | 0% |
| Glass-Steagall, MBS, CDO | - | 511 | 0% | | 392 | 0% | 4 | 330 | 1% |
| Panic Financial Crisis | - | 511 | 0% | - | 392 | 0% | 41 | 330 | 12% |
| Plaintiff's Personal Story | - | 511 | 0% | - | 392 | 0% | 17 | 330 | 5% |
| Reagan Policies | 19 | 511 | 4% | 2 | 392 | 1% | 12 | 330 | 4% |
| Massive Resistance | 13 | 511 | 3% | - | 392 | 0% | 5 | 330 | 2% |
| Gingrich / Republicans Combat Democrats | 13 | 511 | 3% | - | 392 | 0% | 2 | 330 | 1% |
| Blanche K. Bruce | - | 511 | 0% | - | 392 | 0% | 1 | 330 | 0% |
| Rodney King | 3 | 511 | 1% | - | 392 | 0% | 2 | 330 | 1% |
| Tobacco | - | 511 | 0% | 3 | 392 | 1% | 2 | 330 | 1% |
| Dexter Avenue | - | 511 | 0% | - | 392 | 0% | 1 | 330 | 0% |
| Blacks Denied School | - | 511 | 0% | - | 392 | 0% | 6 | 330 | 2% |
| Miscegenation | - | 511 | 0% | 3 | 392 | 1% | 1 | 330 | 0% |
| Large % Of Blacks | - | 511 | 0% | - | 392 | 0% | 2 | 330 | 1% |
| Tax Dollars For Whites | - | 511 | 0% | - | 392 | 0% | 1 | 330 | 0% |
| Brown v. Board | 4 | 511 | 1% | 6 | 392 | 2% | 3 | 330 | 1% |
| Civil Rights | 11 | 511 | 2% | 5 | 392 | 1% | 1 | 330 | 0% |
| Sum | 170 | 511 | 33% | 129 | 392 | 33% | 164 | 330 | 50% |

Note 1: Total pages exclude the bibliography and acknowledgements.

Below are some high-level examples of anomalies between the works. Criminal Justice:

Shock Exchange explains mass incarceration from an economic lens. Attempting to stop supply by locking up drug dealers will not work.

| Plagiarized Work | Shock Exchange |
|---|---|
| (1) The United States has the highest rate of incarceration of any nation on earth … In the early 1970s, our prisons and jails held fewer than 350,000 people; since then that number has increased to about 2.3 million … Because of mandatory sentencing and "three strikes" laws I've found myself representing clients sentenced to life without parole … Bryan Stevenson Essay P.2 | After doing some research, I found that the U.S. has the highest incarceration rate of any country in the "free world." The U.S. incarceration rate has increased from 200 per 100,000 U.S. residents in the mid-90s to 743 per 100,000 residents in 2010 … The U.S. prison policy, highly affected by mandatory drug sentencing, has a higher length of stay relative to the rest of the world. |

| | |
|---|---|
| The prison population quadrupled between 1980 and 2000 due entirely to stiffer sentencing policies, not more crime. Stamped P. 435 | Shock Exchange P.53 |
| (2) And the Reagan administration wanted to make sure that everyone knew it was no morning in America in Black neighborhoods, and that drugs – specifically crack – and drug dealers and users were to blame. Kendi, Stamped P.434 | Reagan's so-called war on drugs turned out to be nothing more than a war on African Americans the increase in incarceration for low-level drug offenders and mandatory sentencing led to black men becoming the most incarcerated group in the world. Shock Exchange P. 80 |

In "passage (1)" Bryan Stevenson carefully imitates Shock Exchange by connoting the U.S. is world's most incarcerated country, the explosive growth in incarceration and mandatory sentencing. In "passage (2)" Kendi highlights the growth in mass incarceration due to stiffer sentencing. In "passage (3)" Kendi mimics Plaintiff's explanation of Reagan's war on drugs. It is well-known that in the '80s Black politicians and Black activists lobbied for tougher sentencing for drug dealing. Ava Duvernay's 2016 documentary, *13TH*, describes that Black politicians' push for tougher drug sentencing during the Reagan era – not slavery or anti-racism – triggered mass incarceration:

> Charlie Rangel: And some people say, 'Well how can you join the person declaring the war on drugs with someone like Ronald Reagan?' I joined with Nancy Reagan because she said, 'Just say no ...' we're not talking about locking up people. (20:30 mark)

> Mark Maurer: Along comes this drug, crack cocaine ... This was just going to just take over communities, in particularly, African American communities ... Congress in virtually record time established mandatory sentencing penalties for crack that were far harsher than those for powder cocaine ... (22:00 mark).

> Jelani Cobb: These sorts of disparities under Reagan quickly exploded into the era of mass incarceration. (23:30 mark)

> Grover Norquist: When crack cocaine hit in the early '80s there were a lot of mayors and so on who felt very strongly that this is a real threat and they wanted to crack down on it and Rangel was one of the guys pushing for stronger sentencing ... Then years later there

17

was an effort to re-write history that there was a racial disparity put in by mean white people. That's not where it came from. (24:20 mark)

Rangel: It may have seemed like a good idea at the time, but it sure didn't work out as being effective. (24:40 mark)[14]

Reagan's Policies:

| Plagiarized Work | Shock Exchange |
|---|---|
| (3) Reagan cut taxes for the rich and social programs … while increasing the military budget.<br>Kendi, Stamped P. 435 | Reagan had become a disciple of "supply-side economics" whereby you provided tax cuts to businesses and the wealthy … The tax cuts and economic growth that were below Reagan's original budget projections had some economists predicting a budget deficit of up to $70 billion … To offset this, Reagan proposed budget cuts … which included … $5 billion by delaying cost-of-living increases in entitlement programs.<br>Shock Exchange P.77 |
| (4) During the Reagan-era, the media and politicians promoted the image of the Black welfare queen – a woman who had babies just to get a check.<br>1619 Project P. 56<br><br>On the presidential campaign trail, Reagan shared a story about Chicago's Susan Taylor, a Black woman charged with welfare fraud.<br>Kendi, Stamped P. 424 | Reagan made the term "Welfare Queen" famous during his campaign and referred to her at every stop … We know today that Reagan totally sensationalized a story about Susan Taylor.<br>Shock Exchange P. 76 |

Shock Exchange argues Reagan's supply-side or "trickle-down" economics doesn't work; Obama's policies, which mirrored Reagan's trickle-down economics, would fail: "With QE1, QE2 … Obama has attached the success of his presidency to the 'trickle-down theory.'"[6] Defendants castigate Reagan but praise Mr. Obama throughout their works. The similitude with Shock Exchange can only be explained through copying.

---

[6] Shock Exchange Page 324.

<u>Capitalism</u>: The 1619 Essay tries to tie mortgage-backed securities ("MBS") and the Glass-Steagall Act.

| Plagiarized Work | Shock Exchange |
|---|---|
| (6) In recent decades, America has experienced the financialization of its economy. In 1980, Congress repealed regulations that had been in place since the 1933 Glass-Steagall Act, allowing banks to merge and charge their customers higher interest rates.<br>1691 Essay By Matthew Desmond | Instead of devising new laws to address financial reform, lawmakers should (i) re-institute Glass-Steagall and (ii) update it to include those products or business lines that may not have existed in the 1930s, but which the "spirit" of Glass-Steagall was designed to address.<br>Shock Exchange P.290 |
| (7) Or consider a Wall Street financial instrument as modern-sounding as collateralized debt obligations (C.D.O.s), those ticking time bombs backed by inflated home prices in the 2000s. C.D.O.s were the grandchildren of mortgage-backed securities based on the inflated value of enslaved people sold in the 1820s and 1830s. Each product created massive fortunes for the few before blowing up the economy.<br>1619 Essay By Matthew Desmond | They helped create a secondary market for these mortgages by (i) packaging them into MBS and (ii) selling them to investors. In doing so, they created liquidity for mortgages, freeing up capital for lenders to make more loans and lowering borrowing costs for prospective homeowners.<br>Shock Exchange P.193 |

Glass-Steagall was a Great-Depression era policy designed to help protect all consumers against Wall Street wrongdoing. Lewis Ranieri, a Wall Street bond trader, is credited with developing the MBS market in the '70s.[7] The similitude can only be explained through copying.

Shock Exchange is highly-creative. Shock Exchange explains the stock market and the U.S. economy through the eyes of the New York Shock Exchange, a financial literacy program Plaintiff started for his 11-year-old son. The kids learned how to pick stocks, and tracked the economy via housing starts and auto sales. They tracked the collapse of housing market and

---

[7] Lewis S. Ranieri: Your Mortgage Was His Bond.

global economy in real time. Plaintiff wrote about the kids' exploits and predicted a stagnant

economy going forward, inequality and social unrest. Despite the naysayers, many of those

predictions have proven spot on. Shock Exchange's creative nature weighs in favor of Plaintiff.

The following illustrates the amount and substantiality of the use.

| | 1619 Combined | Total Pages - Shock Exchange | % Of Total Pages | Stamped / 400 Souls Combined | Total Pages - Shock Exchange | % Of Total Pages |
|---|---|---|---|---|---|---|
| Criminal Justice | 66 | 330 | 20% | 48 | 330 | 15% |
| Reconstruction | 33 | 330 | 10% | 39 | 330 | 12% |
| Black Church | 30 | 330 | 9% | 17 | 330 | 5% |
| Redlining | 10 | 330 | 3% | 2 | 330 | 1% |
| Housing / Wealth / Land | 77 | 330 | 23% | 9 | 330 | 3% |
| Revolt, riots, violence, uprisings, unrest | 116 | 330 | 35% | 93 | 330 | 28% |
| Reparations | 18 | 330 | 5% | 9 | 330 | 3% |
| Glass-Steagall, MBS, CDO | 14 | 330 | 4% | - | 330 | 0% |
| Panic Financial Crisis | 4 | 330 | 1% | - | 330 | 0% |
| Plaintiff's Personal Story | 7 | 330 | 2% | - | 330 | 0% |
| Reagan Policies | 5 | 330 | 2% | 21 | 330 | 6% |
| Massive Resistance | 2 | 330 | 1% | 13 | 330 | 4% |
| Gingrich / Republicans Combat Democrats | 17 | 330 | 5% | 13 | 330 | 4% |
| Blanche K. Bruce | 1 | 330 | 0% | - | 330 | 0% |
| Rodney King | 1 | 330 | 0% | 3 | 330 | 1% |
| Tobacco | 1 | 330 | 0% | 3 | 330 | 1% |
| Dexter Avenue | 2 | 330 | 1% | - | 330 | 0% |
| Blacks Denied School | 2 | 330 | 1% | - | 330 | 0% |
| Miscegenation | 17 | 330 | 5% | 3 | 330 | 1% |
| Large % Of Blacks Tax Dollars For Whites | 2 | 330 | 1% | - | 330 | 0% |
| | 1 | 330 | 0% | - | 330 | 0% |
| Brown v. Board | 6 | 330 | 2% | 10 | 330 | 3% |
| Civi Rights | 18 | 330 | 5% | 16 | 330 | 5% |
| Sum | 450 | 330 | 136% | 299 | 330 | 91% |

Note 1: Total pages exclude the bibliography and acknowledgements.
Note 2: 1619 combined includes the essays and the book.

The 1619 Essay and 1619 Project (book) referenced anomalies of Shock Exchange on a total of

450 pages, copying about 136% of the book. Stamped and 400 Souls copied a combined 91% of

Shock Exchange. This represents unfair use.

The Fourth factor weighs in Plaintiff's favor as defendants have destroyed any market for his existing work and the potential for any future work.

<u>DEFENDANTS COPIED PLAINTIFF'S ARRANGEMENT OF WORDS</u>

Defendants copied Plaintiff's arrangement of words for the 1619 Essay, The 1619 Project (book), and 400 Souls. Language for Ms. Hannah Jones, Michael Harriot and Keisha Blain is incoherent and has no forward movement. Their language is contrived to mimic Shock Exchange. Plaintiff examined (i) the top five repeated words, (ii) total number of times they were repeated ("total occurrence") and (iii) total occurrence divided by top five words ("density"). The language is substantially similar to the "Mass Incarceration" arrangement from Plaintiff's appellate brief in Baker v. Coates, et al. DktEntry: 70-1.

| Plagiarized Work | Arrangement / Scene | Shock Exchange Arrangement / Scene | % Of Shock Exchange | |
|---|---|---|---|---|
| | | | Top 5 Repeated Words | Next 4 Repeated Words |
| 1619 Project - Book | Hannah-Jones | Mass Incarceration | 109% | 97% |
| 1619 Essay | Hannah-Jones | Mass Incarceration | 102% | 89% |
| 400 Souls | Hannah-Jones | Mass Incarceration | 89% | 124% |
| 400 Souls | Harriot | Mass Incarceration | 109% | 118% |
| 400 Souls | Blain | Mass Incarceration | 113% | 108% |

These are not accidental similarities. The chart illustrates substantial similarity and are multiples of that reflected in <u>Hartfield</u>. This represents actual copying.

21

Respectfully Submitted,

_Ralph W. Baker_ (signature)

Ralph W. Baker, Jr.

Date: _1/10/25_ (handwritten)

Sworn before on
January 10, 2025

_(signature)_

Notary

ROBBIN Y. CHASE
Notary Public, State of New York
No. 01CH0000647
Qualified In Kings County
Commission Expires Feb. 03, 2027

Ralph BAKER
112 S. Elliott Pl
Brooklyn NY 11217



United States District Court
500 Pearl Street
Room 250
New York 10007
PRO SE



RECEIVED
JAN 13 2025
PRO SE OFFICE